Good morning, Your Honors. May it please the Court, my name is Judith Leland and I represent the appellant, claimant, Laurell Lair-Del Rio. As I recall, we have a case that says you can look at a later diagnosis to determine what was wrong with the person earlier. Yes, Your Honor. Do you happen to recall what the case is? Yes. Smith v. Bowen is the leading case. Thanks. That's what I'd forgotten. As I recall, the evidence that was mostly discussed in this case was Dr. Gorelick and the psychologist, I can't remember her name. Hazlett. Hazlett. And what actually struck me in the case, when I read about her, I was thinking, hmm, bipolar, maybe a touch of schizophrenia. And I didn't see the medications. Then I got further in the record, and sure enough, there's an M.D. psychiatrist, bipolar, mother was schizophrenic, and he's giving her mood stabilizers and anti-psychotic medication and anti-anxiety medication. I wasn't really clear on what the argument is, whether we're supposed to be using that later diagnosis and treatment. I wasn't sure where it fit in. Okay. And I think what happened was the ALJ just looked at the 2001 report and said, well, it doesn't say anything about 1999, which was the date last insured. However, as Smith v. Bowen and other cases following have said, that the ALJ must look at the longitudinal history of the claimant. In this case, there is a longitudinal history, and that was her treatment with Dr. Hazlett in 1995-96. There was that little note from Dr. Gorlick's, it looks like she worked for Dr. Gorlick, the MFCC, in August of 98, who said that the claimant could not take care of herself or her child. And it was a welfare form that she had filled out. And she said that- What's an MFCC? I'm still thinking about the abbreviation. I'm sorry, Marriage Family Child Counselor. And she said that the disability started in 1997. Then we have the report of Dr. Kendall, who is also a psychologist, and she actually was treating the claimant and her child at the time of the date last insured, June 1999. Could you explain the dates, what's at issue, what isn't at issue, what we have to be reviewing? Certainly. I'm confused on the dates. June 30, 1999 is the date last insured, and the claimant must be found disabled as of that date in order to be entitled to Title II Social Security Disability Insurance benefits. She's been found disabled since then, and she's receiving SSI now, correct? That's correct. And actually, she was found disabled before this administrative law judge's decision. She was found disabled in 2001. And the onset date was? As is done with SSI applications, they only find the person disabled as of the date of the application because there is no retroactivity. Sure. What was the date of the application? It was, I believe it was November or October of 2001. But I think what is... Excuse me. Was she found disabled after an administrative hearing, or was it based on the papers? Or was it based on what? The papers. Oh, you mean the subsequent... The SSI disability. It was, she was approved at the initial level. All right. Counsel, can you help me? One of the problems that the administrative law judge focused on was the lack of medical records to document the diagnoses. I've seen a lot of Social Security cases, but this one is unusual in that either the records no longer exist or the opinion was being given as to a condition preceding the time that the doctor saw the person. Can you help me explain here why we should not conclude from that that the administrative law judge was supported in his decision to reject those opinions because there just isn't any documentation to support that. Well, there is documentation. There is documentation from Dr. Hazlett from 1995 to 1996. She gave the claimant a global assessment of functioning of 40. Whose records are missing? Maybe you can help me. Dr. Hazlett's records that are missing. Yeah, that's the problem. Well, her treatment records are missing. Right. The contemporaneous treatment notes is what we're missing, right? Right. But she indicated in her letter to the administrative law judge that she had kept a summary, and that's what we have in the record. And the administrative law judge says, well, it's all based on subjective complaints, and she didn't really give a diagnosis. That is not true. She said that the claimant presented with depression as evidenced by crying spells. So that, it appears, was how the claimant presented to her. Then she does talk about the complaints of the claimant, and this is necessarily the way psychiatrists and psychologists assess a person. And the social security listing, the preamble to Section 12.00, specifically says, we have to consider, or the doctor has to consider the subjective complaints in mental cases. The ALJ relied on a case called Crane v. Shalala in rejecting Dr. Hazlett's checkoff report. Can you help me with that? Sure. Well, Dr. Hazlett didn't just do a checkoff report. Tell me why he was wrong to rely on that case is really my question. Because the checkoff report by itself may not give sufficient information. But this report was accompanied by the written statements of Dr. Hazlett. So you're, I take it, then you're attempting to distinguish Crane on the basis that even though there were no to meet the requirement of Crane that there be medical substantiation for the opinion. Yes, when taken in light of all the other medical evidence. What other medical evidence? You mean the contemporaneous medical evidence? Pardon? The contemporaneous medical evidence, the current treaters? I would say that Dr. Kendall's letters amounted to contemporaneous reports. They were done after she had treated the claimant, but within a very short period of time. She stopped treating the claimant in December 1999. These letters were written in May. I thought Dr. Kendall was providing therapy to the son. She wasn't the claimant's doctor, was she? Yes, she was. I think that it is incorrect to say that she was only providing therapy to the claimant's son. Well, didn't she refuse treatment? It is true that she did refuse, apparently with Dr. Kendall, to go somewhere else. But she didn't refuse treatment. You can see back even in 95, 96, she was borrowing on her credit card just to get treatment. This is not a refusal of treatment. But didn't Dr. Kendall make an appointment for her and she just didn't show? Yeah. Well, that's the same reason you say she couldn't afford it. Is that the explanation? I'm sorry, what? Is that the explanation, she couldn't afford it, which is why she didn't keep the appointment? No, that's not the only explanation. As in Nguyen v. Chater, this court, in quoting a Sixth Circuit court case, says you can't blame a person who has a mental impairment for not exercising proper judgment if that's part of their problem. And this person clearly was in a very poor situation. She had these juvenile court proceedings going on, which, by the way, the administrative law judge totally ignored. Well, let me just ask you one last question. Is it your position that, well, the way I read the record, the contemporaneous treatment that is prior to the date last insured, while she still enjoyed insured status, would not in and of itself necessarily establish disability. Is it your view that that sufficiently bolsters her subjective complaints so that the ALJ should have found them fully credible? Is that the position you're taking? Yes. And I'd like to point also to Social Security ruling 83-20. It doesn't only talk about the requirement of a medical advisor. It also talks about what other evidence should be considered. It's a very expansive ruling. Yes, but doesn't that ruling just deal with determining an onset date once a disabling impairment is found? Well, a disabling impairment was found in 2001, and this case was in 2003. Okay, fair enough. Thank you. Thank you, counsel. Good morning, Your Honors. My name is Carolyn Chen, representing the Commission of Social Security. I just want to start off by saying that the ALJ's decision should be upheld because it's supported by substantial evidence. As the Court had noted – Let me help you by telling you what's on my mind so that you can address exactly what I'm thinking about. We've now conferred beforehand, so I have no idea whether any of my concerns are shared. As I read this woman's record, I was struck by this letter from Dr. Gorlick, and this is much later. It's in 2006. It turned out he'd been treating her for 20 years, and when he first knew her, she was a businesswoman. She was selling securities and selling tax credit programs. She had a radio talk show. Looks like a very successful, high-functioning woman. And then she falls apart psychiatrically, makes her living, it looks like some kind of shoplifting scheme with her son, constant fighting to try to keep custody of the kid. The neighbors are complaining about the screaming. She can't earn a living. She's getting medical treatment, which is not very successful. And then after a while, she gets treatment. And by 2006, Andrew Winglis is giving her just standard bipolar treatment, Lamictal, a mood stabilizer, Abilify, adjunct therapy for depression and also mania control, and I think I saw Seroquel in here, just your standard psychiatric medicines for that sort of thing. Sure. Now, a lot of times a person is sick and the doctors try one thing and another. They're not sure of the diagnosis. Sometimes you don't get a good diagnosis until you do an autopsy, but at that point it doesn't do the patient a lot of good. What it looks like to me is you've got a really high-functioning woman who turns into a really low-functioning woman, a lot of fiddling until they figure out what's the matter with her, and then you get an MD psychiatrist who figures it out. She gets her disability, and the only issue is whether to look back from that. Right. And I can't see why you wouldn't. So I have a couple of responses. First of all, the ALJ did consider evidence from after the date last insured and found that they did indicate the existence of a problem. He acknowledged that. She acted like she was nuts in a lot of ways. But the notes didn't establish, they didn't clarify the severity or history of a mental impairment during the relevant period of 1998 to 1999. Well, I don't think counsel's maintaining that they do. I think she's maintaining that they bolstered the subjective complaints and the ALJ didn't give proper consideration as a result. There are a lot of things like this, like carpal tunnel syndrome. You see it all the time. It's attributed to a car accident, and it turns out a couple of years later, after more diagnosis, to be instead hypothyroidism. Right. You see it with psychiatric. Gee, it looks like depression. It turns out to be bipolar when the person becomes manic on SSRIs. It happens all the time. Right. Well, I want to respond by saying that claimant feels that these treatment records bolster the claimant's complaints. That's one interpretation of the evidence. The ALJ had the task of looking at the whole entire record and interpreting it and making a decision. And his interpretation, while claimant disagrees with it, is a rational interpretation. And so long as his interpretation is rational, his conclusion should be upheld. And his conclusion is supported by substantial evidence. As it was stated before, there are no medical records directly from the period at issue. However, we have retrospective letters and opinions and findings from Dr. Hazlett and Dr. Kendall. However, those do not establish, I would submit that they don't bolster the claimant's allegations. One, Dr. Hazlett's letter is not supported by any objective findings, no mental status examinations. Under the Social Security Act, the ALJ just cannot credit these reporting of these symptoms at face value. There needs to be some medically accepted techniques of clinical or diagnostic evidence. And Dr. Kendall was not claimant's treating psychologist. She did make some observation of symptoms, but symptoms alone do not establish disability. So they don't really help the ALJ in establishing disability during the relevant period. Well, Dr. Hazlett made a diagnosis, right? She did opine functional limitations. But there are no records. It looked like she and Dr. Gorelick and also that social worker psychologist all thought this woman is mentally ill. None of them knew exactly what the mental illness was. All of them were trying one thing or another to make her better, and none of it was working. Dr. Gorelick definitely noted some psychiatric problems. The ALJ found that these treating records were sporadic. So he didn't really give a lot of weight to them, but he acknowledged that there was an existence of a problem. But, again, they didn't help the ALJ in clarifying the severity of these psychiatric problems. They were just notes of saying that she's not sleeping well, she feels depressed. Well, he also said take her kid away. She can't be a mother. You might be talking about Dr. Kendall. Yes. And Dr. Kendall was not necessarily saying to have the kid taken away, but she was observing. She was merely treating claimant's son and was observing claimant. That treatment didn't start until June of 1999 anyway, did it? I'm sorry? With Dr. Kendall, that treatment commenced in June of 1999, which was after the insured status? It started in June 1999, which is the date last insured, and it ended in December 1999, which is after. Let's say that there is not sufficient medical evidence to necessarily conclude conclusively of a disabling impairment prior to June of 1999. We do have evidence that tends to support it, and we have the claimant's subjective complaints. In order to disregard those or find that they are not credible, the ALJ has an obligation to point to some evidence upon which he rejects that conclusion. Right. And so what is it here? Well, as far as claimant's complaints, her allegations of a disabling impairment, the ALJ did make a credibility evaluation, said that he considered the complaints, found that there was some kind of anxiety impairment, said it was severe and limited her to being only able to do unskilled work. However, he found that her allegations of disability were not credible. She had access to treatment, and she refused to get treatment, and someone can't claim to be disabled. Is that it? He also noted that medication was shown to stabilize the very impairments that she complained were, I mean, sorry, the very symptoms that she complained were disabling. Is there anything like daily activities, employment inconsistencies that he pointed to? I didn't see it. You're right, Your Honor. He didn't specifically point to daily activities. The district court reviewed the ALJ's decision, found that his credibility evaluation was supported by the record, which did show that she could carry on daily activities of preparing food, going grocery shopping, taking care of herself and her son. Doesn't the ALJ have to discuss that in his opinion? I would submit that his reasons regarding the refusal of treatment and medication was clear and convincing and satisfied that burden. The district court felt that the credibility evaluation was supported by substantial evidence, and they can look to anything in the record to make that conclusion that's supported by substantial evidence. Let me ask you about the refusal to obtain treatment. It looked as though that was persuasively explained by two things, one, not having the money for it, and two, being mentally ill and not having the insight and judgment for it on account of the illness itself. I would respond to that by saying that the record simply does not support Clayman's reasons for not getting treatment. She says that she was financially unable to get treatment. However, as the ALJ noted and Clayman has conceded in prior pleadings to the district court, that she did have access to Medi-Cal. She was getting AFDC, which is AIDS, to families with dependent children. And also, the record shows that she actually did get treatment from a number of medical professionals, including Dr. Hazlett and other doctors, and most significantly, the Orange County Mental Health Center, which is- What about the lack of insight and judgment for mental illness, though? I mean, I read the letter that she wrote to, I can't remember if it was the ALJ or the district judge, after they ruled against her, and she sounded nuts. This case is different from the type of case that this court was concerned about in Nguyen. She has not exhibited a lack of awareness or good judgment about her condition, because she did, by her own initiative, seek treatment from Dr. Hazlett. And so the evidence just doesn't support that she's the type of Clayman who just did not have an awareness and that was a sign of her sickness. This is a different type of situation. Counsel, I note that the district court had previously directed a remand to the administrative law judge to follow up on some of these issues. Is that right? That's correct. I'm looking at the- I guess it's page- I think it's 31. It's kind of faint. It's page 5 of the ALJ's second report, which is dated August the 9th of 2006. Yes. It indicates that he tried to recontact Dr. Kendall in order to talk further with her about the basis for her opinion, but it says that Dr. Kendall basically didn't return his call. Is that right? That's correct. And then in the paragraph below that, it talks about the Orange County health care records, and that's the paragraph that concludes with the ALJ's finding that the lack of medical care is to a large extent volitional and not, as the remand opinion noted, based on lack of money or availability. And what was it that was in those records that you say supports that finding? The finding that she refused treatment or that she had financial- Yeah, that the reason she didn't pursue further treatment was because she didn't have the financial resources to do it. He discusses it in the same paragraph that he's talking about, the Orange County health care records. Well, in the record, in Dr. Kendall's letter, she did note that the claimant was receiving AFDC, and in the Orange County records, I don't know the exact page, but they do refer to AFDC there as well. So she was essentially getting California AFDC aid. Yeah. I would just like to close by saying that the ALJ properly considered the evidence. A district court looked at this case two times. The first time, remanded it. The second time, felt that the ALJ addressed all of its concerns and was satisfied with the ALJ's decision. I respectfully ask this court to affirm the district court's decision affirming the ALJ's decision. Thank you. Thank you, counsel. Larry Valrio is submitted. Hudson Harry Stewart is submitted.
judges: Lawson, Kleinfeld, Tallman